Jeffrey Alexander **STERLING,**
Plaintiff–Appellant,

v.

George **TENET, Director, Central Intelligence Agency, Defendant–Appellee,**

and

**John Does 1–10, Defendant.**

No. 04–1495.

United States Court of Appeals,
Fourth Circuit.

Argued May 26, 2005.

Decided Aug. 3, 2005.

**ARGUED:** Mark Steven Zaid, Krieger & Zaid, P.L.L.C., Washington, D.C., for Appellant. William Joseph Howard, Assistant United States Attorney, Department of Homeland Security, Washington, D.C., for Appellee. **ON BRIEF:** George R.A. Doumar, Arlington, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Larry Lee Gregg, Assistant United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINS, Chief Judge, and WILKINSON and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge WILKINS and Judge GREGORY joined.

## OPINION

WILKINSON, Circuit Judge.

 In this case we consider the applicability of the "state secrets doctrine" to a Title VII racial discrimination claim brought against the Director of Central Intelligence and ten unnamed CIA employees by a CIA covert agent. That doctrine embodies an evidentiary "privilege which protects military and state secrets" from disclosure in judicial proceedings. *United States v. Reynolds,* 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The Supreme Court has recently and unanimously reaffirmed the vitality of the privilege. *See Tenet v. Doe,* —— U.S. ——, —————, 125 S.Ct. 1230, 1236–37, 161 L.Ed.2d 82 (2005). The district court properly concluded that this case would require disclosure of highly classified information concerning the identity, location, and assignments of CIA operatives. We therefore affirm its judgment that the state secrets doctrine requires dismissal of the case.

I.

Jeffrey Sterling, an African American, was an Operations Officer in the CIA's Near East and South Asia division from 1993 to 2001. He alleges that during this time he experienced unlawful discriminatory practices at the hands of CIA management. For instance, Sterling believes that the expectations for him were "far above those required of non-African-American Operations Officers." He says his superiors repeatedly denied him advantageous opportunities, subjected him to disparate treatment, and gave him Advanced Work Plans that contained more rigorous requirements than those given to non-African Americans.

He also alleges retaliation for utilizing the internal Equal Employment Opportunity ("EEO") process. He claims that he was scheduled to undergo security processing earlier than he should have been. According to him, security processing is an "arbitrary regime within the CIA that is utilized more for its nature as a tool for intimidation than any substantive security implications." He also asserts that management vandalized his personal property.

Sterling initially filed a pro se complaint in the Southern District of New York in August 2001, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. A complaint (redacted because the CIA objected that the

original contained classified information) was served on the government in January 2002. The district court in the Southern District of New York granted a motion to transfer the case to the Eastern District of Virginia, where the CIA is located. Although the government also asked the judge in New York to dismiss the case based on the state secrets doctrine, he specifically declined to endorse the government's argument.

The CIA renewed its invocation of the state secrets doctrine in the Eastern District. The Director filed both an unclassified and a classified declaration explaining why allowing Sterling to pursue his case would threaten exposure of classified information. The district court conducted an ex parte, in camera examination of both declarations. It satisfied itself that the Director had personally considered the national security implications of both the information that Sterling would need to establish his case as well as the information that would likely become public if the litigation were to continue.

The district court thus granted the motion to dismiss. It noted that for Sterling to pursue his claim, he would have to disclose the nature and location of his employment and the employment of those similarly situated. Yet Sterling's duties and those of his colleagues—and even the names of most of his supervisors and colleagues—were classified, rendering comparative proof of discrimination impossible. After a thorough review, the court concluded that the state secrets doctrine operated to preclude this suit because it barred the evidence that would be necessary to state a prima facie claim. State secrets, the court held, were critical to the resolution of core factual questions in the case, and therefore the doctrine justified dismissal.

■ Sterling timely appealed the district court's order. We review such legal

determinations involving state secrets de novo. *See Molerio v. FBI*, 749 F.2d 815, 820 (D.C.Cir.1984); 26A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5693 (Supp. 2005).

## II.

This case turns on the breadth of the state secrets doctrine, both as to when the privilege can be invoked and as to when a properly invoked privilege justifies dismissing a plaintiff's claim altogether.

### A.

The Supreme Court set forth the state secrets doctrine in *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The Court's discussion of *Reynolds* last Term in *Tenet v. Doe*, —— U.S. ——, —— –——, 125 S.Ct. 1230, 1236–37, 161 L.Ed.2d 82 (2005), confirms its continued validity. *See also* Fed.R.Evid. 501 (government evidentiary privilege in federal law cases is a matter of federal common law).

*Reynolds* concerned suits that followed the crash of a military aircraft that had been testing secret electronic equipment. The government "filed a formal 'Claim of Privilege'" in which it argued that the aircraft was on " 'a highly secret mission of the Air Force,'" and disclosure of the requested materials would " 'seriously hampe[r] national security, flying safety and the development of highly technical and secret military equipment.'" 345 U.S. at 4–5, 73 S.Ct. 528. The Court held that widows of those killed in the accident could not demand "production of the Air Force's official accident investigation report" and other such documents to assist their suit under the Federal Tort Claims Act. *Id.* at 3, 73 S.Ct. 528. The Court sustained the government's refusal to produce the materials by citing "the privilege against re-

vealing military secrets, a privilege which is well established in the law of evidence." *Id.* at 6–7, 73 S.Ct. 528 (citing, inter alia, *Totten v. United States*, 92 U.S. 105, 107, 23 L.Ed. 605 (1875)). "[S]tate secrets" and military secrets are equally valid bases for invocation of the evidentiary privilege. *Id.* at 7, 73 S.Ct. 528.

*Reynolds* explained the nature of the privilege and the process for applying it:

> The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect.

*Id.* at 7–8, 73 S.Ct. 528 (footnotes omitted).

Judicial involvement in policing the privilege is important, but the Court emphasized limitations on a judge's supervisory function. *Reynolds* analogized the judicial inquiry in a state secrets case to the judge's role in regulating the invocation of the privilege against self-incrimination. "Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses." *Id.* at 8, 73 S.Ct. 528.

■ Recognizing this conflict as a "real difficulty," *id.*, the Court resolved it the same way it had resolved the identical dilemma in the self-incrimination context, *see id.* at 8–10, 73 S.Ct. 528. "[T]he court must be satisfied from all the evidence and circumstances, and 'from the implications of the question ... that a responsive answer ... or an explanation of why it can-

not be answered might be dangerous because injurious disclosure could result.'" *Id.* at 9, 73 S.Ct. 528 (quoting *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). In other words, once the court is "satisfied" that any response at all to a question or request for production might have a deleterious effect on national security, "the claim of the privilege will be accepted without requiring further disclosure." *Id.* at 9, 73 S.Ct. 528.

### B.

■ What is required to satisfy a district judge will depend on the circumstances of the case. The plaintiff's "showing of necessity" for the privileged evidence "will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." *Reynolds*, 345 U.S. at 11, 73 S.Ct. 528. However, national security concerns are paramount, for "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Id.* (citing *Totten* ).

Thus, *Reynolds* made clear that the process of "satisfying" a district judge that the privilege has been properly invoked does not necessarily require in camera review of all the materials likely to contain state secrets:

> Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers. Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case. It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose

military matters which, in the interest of national security, should not be divulged. *Id.* at 9–10, 73 S.Ct. 528. The Court held that "[w]hen this is the case ... the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.* at 10, 73 S.Ct. 528.

The Supreme Court reaffirmed this principle in *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). That case relied heavily upon *Reynolds* in discussing a judge's role in determining whether a particular attorney-client conversation fell outside the attorney-client privilege because the client was seeking advice regarding the perpetration of "a future crime or fraud." *Id.* at 563, 109 S.Ct. 2619. Even in that context, far removed from the national security concerns at stake when the state secrets doctrine is invoked, the Court refused to undermine the evidentiary privilege by automatically requiring in camera review of presumptively privileged materials. *Id.* at 570–71, 109 S.Ct. 2619 (citing *Reynolds* ). Instead, "the party seeking in camera review must make some threshold showing that such review is appropriate." *Id.* at 570, 109 S.Ct. 2619.

■■ *Zolin* was sensitive to "the burdens in camera review places upon the district courts," and refused to allow parties to force "groundless fishing expeditions" upon them. *Id.* at 571, 109 S.Ct. 2619. This admonition certainly applies where national security concerns are involved. Once the judge is satisfied that there is a "reasonable danger" of state secrets being exposed, *Reynolds,* 345 U.S. at 10, 73 S.Ct. 528, any further disclosure is the sort of "fishing expedition" the Court has declined to countenance. Courts are not required to play with fire and chance further disclosure—inadvertent, mistaken, or even intentional—that

would defeat the very purpose for which the privilege exists.

The threat of "graymail" likewise counsels courts to be cautious about risking exposure of sensitive materials. Graymail is a practice where "individual lawsuits [are] brought to induce the CIA [or another government agency] to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations." *Tenet,* 125 S.Ct. at 1238. Unlike a criminal case, where the government can drop the charges if it fears that litigation presents unacceptable security risks, civil claims put the plaintiff in the driver's seat. *See Reynolds,* 345 U.S. at 12, 73 S.Ct. 528. The state secrets privilege provides a necessary safeguard against litigants presenting the government with a Hobson's choice between settling for inflated sums or jeopardizing national security. Were judges to fail to take care to avoid unnecessary risks of disclosure when the privilege is invoked, the incentives for graymail would correspondingly increase.

■ In sum, once a formal and proper claim of privilege has been made, district courts frequently can satisfy themselves of the sufficiency of that claim through the explanation of the department head who is lodging it. Such explanations often come in the form of affidavits or declarations made personally by the department head. *See, e.g., Bowles v. United States,* 950 F.2d 154, 156 (4th Cir.1991)(assertion by Secretary of State); *In re Under Seal,* 945 F.2d 1285, 1287 (4th Cir.1991) (affidavit by Secretary of Defense); *Fitzgerald v. Penthouse Int'l, Ltd.,* 776 F.2d 1236, 1242, 1243 n. 9 (4th Cir.1985) (affidavit by Secretary of the Navy); *Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 281 (4th Cir.1980) (en banc) (affidavit by Secretary of the Navy).

There may of course be cases where the necessity for evidence is sufficiently strong and the danger to national security sufficiently unclear that in camera review of all materials is required to evaluate the claim of privilege. But both Supreme Court precedent and our own cases provide that when a judge has satisfied himself that the dangers asserted by the government are substantial and real, he need not—indeed, should not—probe further.

### III.

Sterling contends that the state secrets evidentiary privilege does not require dismissal of his claim. He argues that the "district court abdicated its responsibility" when it reached the opposite conclusion. He bases this assertion on his belief that the privilege was improperly invoked and that the district court should have attempted to devise "adequate protective measures" to allow the case to proceed even if classified materials were a part of it. Applying the foregoing standards, however, we conclude that the state secrets evidentiary privilege was indeed applicable and required the dismissal of Sterling's claim.

### A.

Sterling may prevail in his Title VII claim in one of two ways. First, he may present direct evidence of his superiors' discriminatory intent. Second, he may attempt to satisfy the test specified in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which allows him to raise an inference of discriminatory intent by showing that he was treated worse than similarly situated employees of other races. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir.2004). Defendants are then entitled to respond by presenting a legitimate, nondiscriminatory reason for their actions. *See, e.g., Gillins v. Berkeley*

*Elec. Coop.*, 148 F.3d 413, 415 (4th Cir. 1998). The burden would finally shift back to Sterling to demonstrate that this reason was a pretext for discrimination. *Id.* at 415–16.

"Regardless of the route a plaintiff follows in proving a Title VII action, . . . the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004) (citation and footnote omitted). Here, Sterling seeks to prove discriminatory adverse employment actions by presenting evidence that higher expectations were placed upon him than upon similarly situated non-African American CIA operatives and that he was passed over for operational opportunities. He further alleges defendants retaliated against him for lodging his EEO complaint by forcing him to undergo a premature security screening and vandalizing his personal property.

### B.

Consideration of the state secrets privilege can only proceed if the privilege was properly invoked under the procedures described by *Reynolds*. Here, the district court correctly determined that those procedures were followed. There is no doubt that the Director is "the head of the department which has control over the matter" and has lodged a formal claim of privilege. *Reynolds*, 345 U.S. at 7–8, 73 S.Ct. 528. He has stated that this claim came after his personal consideration of the matter, and in both classified and unclassified declarations, he has explained why the privilege must be applied. *See id.*

The subsequent inquiry is whether the materials necessary for pressing Sterling's Title VII claim or defending against it are likely to result in inappropriate disclosure of state secrets. The district court noted the Director's declaration that litigating the factual issues in this

case would compromise CIA sources and methods, threaten the safety of intelligence sources, and adversely affect foreign relations. There is no question that "information that would result in ... 'disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments'" falls squarely within the definition of state secrets. *Molerio,* 749 F.2d at 820–21 (quoting *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C.Cir.1983)). We are convinced, as was the district court, that such information forms the very basis of the factual disputes in this case.

As a covert operative, Sterling's position and responsibilities inherently involved state secrets. We hardly need defend the proposition that CIA personnel, activities, and objectives must be protected from prying eyes. The Supreme Court has noted in the context of discussing the Freedom of Information Act (FOIA) "that Congress intended to give the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process. The reasons are too obvious to call for enlarged discussion; without such protections the Agency would be virtually impotent." *CIA v. Sims,* 471 U.S. 159, 170, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985).

This national security concern is particularly acute here because as a covert operative, the nature of Sterling's duties may well have involved recruiting foreign sources of intelligence. Congress has imbued the Director with "very broad authority to protect all sources of intelligence information from disclosure." *Id.* at 168–69, 105 S.Ct. 1881 (discussing FOIA). " 'The continued availability of intelligence sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger their personal safety.' " *Id.* at 175–76, 105 S.Ct. 1881 (quoting *Snepp v. United States,* 444 U.S. 507, 512, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam)) (alterations omitted).

There is no way for Sterling to prove employment discrimination without exposing at least some classified details of the covert employment that gives context to his claim. If he were to employ the *McDonnell Douglas* framework to establish his prima facie case, he would be required to show that he was treated worse than similarly situated non-African American agents. This inquiry would expose classified information involving not only Sterling's activities, but those of other agents as well. It would be impossible to avoid investigation into the comparative responsibilities of Sterling and other CIA agents, the nature and goals of their duties, the operational tools provided (or denied) to them, and their comparative opportunities and performance in the field.

Similar comparative evidence is necessary for Sterling to meet his further burden of establishing that he suffered an adverse employment action.* Every such action that he alleges rests upon an assertion that non-African Americans were treated more favorably than he. Sterling claims that the expectations for his performance were "far above those required of non-African-American Operations Officers," that his Advanced Work Plan "was considerably more demanding and 'harsher' than any requirements placed on non-African-Americans," and that he was "re-

---

* Sterling's suggestion that he could avoid *McDonnell Douglas* comparative analysis by presenting direct evidence of discrimination is therefore unavailing. Assuming such evidence sufficient to prove discriminatory in-tent, some type of comparator would still be necessary to establish that he in fact suffered one of the adverse acts of discrimination that he alleges.

peatedly passed over for operational opportunities" (which presumably went to less qualified operatives of other races). Proof of these allegations would require inquiry into state secrets such as the operational objectives and long-term missions of different agents, the relative job performance of these agents, details of how such performance is measured, and the organizational structure of CIA intelligence-gathering.

Sterling's retaliation claims similarly depend on proof of facts that are state secrets. He cannot prove his assertion that CIA security processing is an "arbitrary regime ... that is utilized more for its nature as a tool for intimidation than any substantive security implications" without evidence regarding the CIA's internal security procedures. And his claim of personal property vandalism would require proof of details regarding where and when it might have happened, who his superiors were who might have ordered it, and why they had cause to retaliate against him.

Even assuming Sterling were somehow able to manage the impossible feat of making out all the elements of a Title VII claim without revealing state secrets, further issues would remain. The government would be entitled to present, as a defense to Sterling's prima facie case, legitimate nondiscriminatory reasons for its actions. This defense would have to show exactly why the CIA gave Sterling different assignments and different operational tools from his peers. The evidence required would inescapably reveal the criteria inherent in sensitive CIA decisionmaking.

Furthermore, the very methods by which evidence would be gathered in this case are themselves problematic. Many of the witnesses would necessarily be covert CIA operatives. Forcing such individuals to participate in a judicial proceeding—or even to give a deposition—risks their cov-

er. And once they do appear, it is doubtful what information they could provide that would not have national security implications. Almost any relevant bit of information could be dangerous to someone, even if the agent himself was not aware that giving the answer could jeopardize others. The Supreme Court has cautioned that "what may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *Sims,* 471 U.S. at 178, 105 S.Ct. 1881 (quotation marks omitted). Only the Director has the expertise to attest—as he has—to this larger view. *Cf. id.* (noting that Congress has granted the Director the power under FOIA even "to withhold superficially innocuous information" if it "might enable an observer to discover the identity of an intelligence source").

In short, the Director has met the requirements for application of the state secrets doctrine here and went beyond them, providing a classified declaration, which the district court was able to review in camera. The district court's reliance on that declaration, combined with the highly classified nature of the allegations in Sterling's own complaint, was more than adequate to conclude that the state secrets privilege was properly invoked.

C.

 Even if the state secrets privilege is applicable, Sterling contends that dismissal of his entire case was error. Like the district court, however, we believe that dismissal follows inevitably when the sum and substance of the case involves state secrets.

 We have long recognized that when "the very subject of [the] litigation is itself a state secret," which provides "no way [that] case could be tried without com-

promising sensitive military secrets," a district court may properly dismiss the plaintiff's case. *Fitzgerald,* 776 F.2d at 1243; *see also Farnsworth Cannon,* 635 F.2d at 281 (dismissal ordered since establishing a prima facie case was impossible without threatening to disclose privileged information). To be sure, dismissal is appropriate "[o]nly when no amount of effort and care on the part of the court and the parties will safeguard privileged material." *Fitzgerald,* 776 F.2d at 1244. But where "the very question on which a case turns is itself a state secret, or the circumstances make clear that sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters," dismissal is the proper remedy. *DTM Research, LLC v. AT & T Corp.,* 245 F.3d 327, 334 (4th Cir.2001) (quotation marks omitted).

 Needless to say, litigation centering around a covert agent's assignments, evaluations, and colleagues meets this test. "[H]ere, the whole object of the suit and of the discovery is to establish a fact that is a state secret," *Molerio,* 749 F.2d at 821—namely, the methods and operations of the Central Intelligence Agency. As explained above, Sterling cannot prove his Title VII claim, nor can the government defend against it, without presenting evidence on topics that are state secrets. "If the case cannot be tried without compromising sensitive foreign policy secrets, the case must be dismissed." *Bowles,* 950 F.2d at 156.

Sterling's argument that the court could devise special procedures that would allow his suit to proceed must therefore fail. Such procedures, whatever they might be, still entail considerable risk. Inadvertent disclosure during the course of a trial—or even in camera—is precisely the sort of risk that *Reynolds* attempts to avoid. At best, special accommodations give rise to added opportunity for leaked information. At worst, that information would become public, placing covert agents and intelligence sources alike at grave personal risk.

### D.

We recognize that our decision places, on behalf of the entire country, a burden on Sterling that he alone must bear. "When the state secrets privilege is validly asserted, the result is unfairness to individual litigants—through the loss of important evidence or dismissal of a case—in order to protect a greater public value." *Fitzgerald,* 776 F.2d at 1238 n. 3. Yet there can be no doubt that, in limited circumstances like these, the fundamental principle of access to court must bow to the fact that a nation without sound intelligence is a nation at risk. *See Reynolds,* 345 U.S. at 11, 73 S.Ct. 528.

We take comfort in the fact that Sterling and those similarly situated are not deprived of all opportunity to press discrimination claims. The CIA provides, and Sterling has utilized, an internal EEO process where his claims may be heard and resolved. While the state secrets privilege is not contingent on the availability of such internal or administrative process, invocation of the privilege in federal court must not operate to discourage the CIA's own efforts to provide a working environment that honors our nation's bedrock commitment to nondiscrimination and fair treatment.

### IV.

The Director has satisfied us, as he did the district court, of the "reasonable danger that the [material sought by Sterling] would contain references to the secret" anti-terror or other national security concerns that were "the primary concern" of hiring Sterling as a covert operative in the first place. *Reynolds,* 345 U.S. at 10, 73

S.Ct. 528. We are neither authorized nor qualified to inquire further. For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*