**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-2568**

---

JACOB E. ABILT, Maryland, United States,

Plaintiff - Appellant,

v.

CENTRAL INTELLIGENCE AGENCY; JOHN O. BRENNAN, Director, In his official capacity only,

Defendants - Appellees.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:14-cv-01626-GBL-MSN)

---

Argued: October 27, 2016          Decided: February 8, 2017

---

Before WYNN, FLOYD, and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Wynn and Judge Harris joined.

---

**ARGUED:** Donna Renee Williams Rucker, TULLY RINCKEY PLLC, Washington, D.C., for Appellant. Jaynie Randall Lilley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Sharon Swingle, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

FLOYD, Circuit Judge:

This is an appeal from the dismissal of a complaint under the state secrets doctrine. After careful consideration of the public and classified pleadings, the district court correctly concluded that the information in question is properly privileged and that litigation of the case would present an unjustifiable risk of disclosure of that information. Accordingly, we affirm.

I.

Appellant Jacob E. Abilt[1] was hired by the Central Intelligence Agency (CIA or the "Agency") in June 2006 as an Applications Developer. Around the time he was hired, Abilt informed the Agency that he had a diagnosis of narcolepsy. Beginning in May 2008 until the ultimate termination of his employment in October 2011, Abilt was a covert employee. Many of the basic facts regarding Abilt's employment with the Agency are classified, as are the job responsibilities and even the identities of most of his former supervisors and co-workers.

In early 2009, Abilt began experiencing difficulty with his narcolepsy and asked his then-supervisor for permission to take

---

[1] Due to the sensitive nature of his job responsibilities, Abilt is proceeding under a pseudonym.

periodic naps, which his then-supervisor granted. Around the same time, Abilt was cleared by the Agency's Medical Officer for a temporary duty yonder (TDY) assignment overseas, as well as to a warzone.[2]

Abilt was then assigned a new supervisor, referred to in the record only as "Lee." When Lee witnessed Abilt sleeping at his desk, Lee delayed Abilt's TDY assignment by 30 days in March 2009. When Abilt complained, he was told that his TDY assignment was delayed six months due to potential concerns about his narcolepsy, and a few weeks later told that he could not travel overseas for six months, or to a warzone for twelve months. Abilt was instructed that any future decision would be based in part on his ability to manage his narcolepsy.

At the end of the six-month period, Abilt requested TDY assignment, and was told there were no plans to send anyone overseas. Abilt alleges that multiple of his co-workers without disabilities were subsequently sent overseas. Abilt was evaluated again by the Agency's Medical Officer, and both Abilt and Lee were informed that Abilt was medically cleared to travel to a warzone. At the end of the twelve-month period, Abilt was given a list of new requirements he would have to meet to be

---

[2] Agency employees who go on TDY assignment to a warzone earn income above their standard salary.

assigned overseas or to a warzone. Abilt alleges that the new requirements applied only to him.

In March 2011, Abilt was authorized for TDY overseas, but denied a TDY assignment to a warzone. The Agency informed him that he needed to complete a TDY overseas assignment before he could be authorized for a TDY assignment to a warzone. Abilt successfully completed his TDY overseas assignment, and then requested a TDY assignment to a warzone. After undergoing two examinations, both of which Abilt passed, he was still denied, allegedly because of safety concerns related to his narcolepsy.

During this time, Abilt complained to the Equal Employment Opportunity (EEO) office about his treatment, and he alleges that as a result, Lee delayed his TDY overseas assignment and also refused to provide him with the same training and opportunities offered to his co-workers. Abilt filed administrative complaints in both 2009 and 2010 alleging disability discrimination, failure to accommodate, and retaliation. The Agency issued a decision rejecting his claims as unsupported in 2011. The Equal Employment Opportunity Commission (EEOC) affirmed the Agency's decision. Abilt's employment with the Agency was ultimately terminated in October 2011.

Abilt first filed suit against the Agency and Director John Brennan (collectively, still the "Agency") in February 2014,

4

alleging discrimination and ultimately termination based on his disability, failure to accommodate, and retaliation. The Agency invoked the state secrets privilege over various information related to Abilt's employment. The district court held that the Agency properly invoked the privilege, and dismissed the complaint without prejudice, finding that Abilt could not prove his prima facie case of discrimination without resorting to privileged information. See Abilt v. C.I.A. (Abilt I), No. 14-cv-1031, 2015 WL 566712 (E.D. Va. Feb. 10, 2015).

While the motion for summary judgment was pending in his first suit, Abilt filed this suit (Abilt II) against the same defendants on December 1, 2014, under the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (codified as amended at 29 U.S.C. § 791, et seq.), and Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. § 2000e to § 2000e-17), alleging disability discrimination and failure to accommodate, as well as retaliation. In particular, Abilt alleged that the CIA canceled his TDY assignment to a warzone because of his disability, denied him other assignments and training opportunities available to his coworkers, and falsely reported that he was failing to satisfactorily perform his clandestine work assignments. After Abilt I was dismissed, the Agency moved for summary judgment in Abilt II based on the state secrets

privilege. In support, the Agency submitted two declarations from Dir. Brennan--one public, which explained how disclosure of information would harm national security and compromise the Agency, and one ex parte, in camera, that further explained the scope of information subject to the assertion of privilege. The district court held that the Agency had properly invoked the state secrets privilege, and found that because the un-appealed decision in Abilt I covered many of the same categories of information, Abilt was barred from relitigating those same issues. The court then dismissed the action because (1) privileged information was at the core of Abilt's prima facie case; (2) the Agency could not defend its case without resorting to privileged information; and (3) further litigation would risk disclosure of privileged information.

Abilt timely appealed the district court's decision in this suit, arguing that the district court misapplied the state secrets doctrine.

II.

"We review de novo a district court's 'legal determinations involving state secrets,' including its decision to grant dismissal of a complaint on state secrets grounds." El-Masri v. United States, 479 F.3d 296, 302 (4th Cir. 2007) (quoting Sterling v. Tenet, 416 F.3d 338, 342 (4th Cir. 2005)).

6

"Under the state secrets doctrine, the United States may prevent the disclosure of information in a judicial proceeding if 'there is a reasonable danger' that such disclosure 'will expose military matters which, in the interest of national security, should not be divulged.'" Id. at 302 (quoting United States v. Reynolds, 345 U.S. 1, 10 (1953)).[3] The doctrine's modern form was set forth by the Supreme Court in Reynolds, and its continued validity has been repeatedly confirmed by the Supreme Court and by this Court. See, e.g., Tenet v. Doe, 544 U.S. 1 (2005); El-Masri, 479 F.3d at 302-03; Sterling, 416 F.3d at 342.

Reynolds dealt with suits filed under the Federal Tort Claims Act arising from the deaths of three civilians in the crash of a military aircraft that had been testing secret electronic equipment. 345 U.S. at 2-3. The government filed a "formal 'Claim of Privilege'" arguing that the plane had been on "a highly secret mission of the Air Force," and that disclosure of the requested materials would "seriously hamper[ ] national security, flying safety and the development of highly technical and secret military equipment." Id. at 4-5 (internal quotation marks omitted). The Court sustained the government's claim of

---

[3] "State secrets and military secrets are equally valid bases for invocation of the evidentiary privilege." Sterling, 416 F.3d at 343 (internal quotation marks and alterations omitted).

7

privilege, finding that "the privilege against revealing military secrets . . . is well established in the law of evidence." Id. at 6-7. The Court in a footnote cited a long line of decisions, both American and English, recognizing the government's privilege against revealing state secrets. Id. at 7, n.11 (collecting cases and secondary sources).[4]

The resolution of a claim of state secrets privilege requires a three-step analysis. El-Masri, 479 F.3d at 304. First, "the court must ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied." Id. Second, "the court must decide whether the information sought to be protected qualifies as privileged under the state secrets doctrine." Id. Third, if the "information is determined to be privileged, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim." Id.

A.

The procedural requirements for invoking the state secrets privilege were established by the Supreme Court in Reynolds.

---

[4] See, e.g., Totten v. United States, 92 U.S. 105, 107 (1875) ("[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated.").

8

345 U.S. at 7-8.  First, the state secrets privilege must be asserted by the United States government; it "can neither be claimed nor waived by a private party."  Id. at 7 (footnotes omitted).  Second, "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter."  Id. at 7-8. Third, the department head's formal claim of the state secrets privilege may be made only "after actual personal consideration by that officer."  Id. at 8.

B.

"After a court has confirmed that the Reynolds procedural prerequisites are satisfied, it must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure."  El-Masri, 479 F.3d at 304.  This determination "places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system."  Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1203 (9th Cir. 2007).

The state secrets privilege "performs a function of constitutional significance, because it allows the executive branch to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities."  El-Masri, 479 F.3d at 303.  As such, the executive's determination that

9

disclosure of information might pose a threat to national security is entitled to "utmost deference." United States v. Nixon, 418 U.S. 683, 710 (1974), superseded by statute on other grounds as recognized by Bourjaily v. United States, 483 U.S. 171, 177–79 (1987).

Yet at the same time, "'[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers'--no matter how great the interest in national security." El-Masri, 479 F.3d at 304 (quoting Reynolds, 345 U.S. at 9-10) (alteration in quoting source); see also Sterling, 416 F.3d at 343 (noting the importance of "[j]udicial involvement in policing the privilege"). When the privilege is validly asserted, "the result is unfairness to individual litigants," Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1238, n.3 (4th Cir. 1985); thus, "to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation." Ellsberg v. Mitchell, 709 F.2d 51, 58 (D.C. Cir. 1983). "We take very seriously our obligation to review the [government's claims] with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege." Al-Haramain, 507 F.3d at 1203. Appropriate judicial oversight is vital to protect against the "intolerable

10

abuses" that would follow an "abandonment of judicial control," Reynolds, 345 U.S. at 8.

The Supreme Court balanced these concerns in Reynolds "by leaving the judiciary firmly in control of deciding whether an executive assertion of the state secrets privilege is valid, but subject to a standard mandating restraint in the exercise of its authority."  El-Masri, 479 F.3d at 304-05.  As such, "[a] court is obliged to honor the Executive's assertion of the privilege if it is satisfied, 'from all the circumstances of the case that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.'"  Id. at 305 (quoting Reynolds, 345 U.S. at 10).

The burden is on the government to satisfy the "reviewing court that the Reynolds reasonable-danger standard is met."  Id. "Frequently, the explanation of the department head who has lodged the formal privilege claim, provided in an affidavit or personal declaration, is sufficient to carry the Executive's burden."  Id.; citing Sterling, 416 F.3d at 345 (relying on declarations of CIA Director); Reynolds, 345 U.S. at 5 (relying

on a claim of privilege by Secretary of the Air Force and an affidavit of the Air Force Judge Advocate General).[5]

Once this burden is carried, "the claim of privilege will be accepted without requiring further disclosure." Reynolds, 345 U.S. at 9. Although it is for the court to determine "whether the circumstances are appropriate for the claim of privilege," we must "do so without forcing a disclosure of the very thing the privilege is designed to protect." Reynolds, 345 U.S. at 7-8. "[B]oth Supreme Court precedent and our own cases provide that when a judge has satisfied himself that the dangers asserted by the government are substantial and real, he need not--indeed, should not--probe further." Sterling, 416 F.3d at 345.

## C.

Once the information is found to be properly privileged, the final step in the state secrets privilege analysis is for

---

[5] It is important to note that, by itself, "an executive decision to classify information is insufficient to establish that the information is privileged." Mohamed v. Jeppesen Dataplan, Inc., 614 F.3d 1070, 1082 (9th Cir. 2010); see also Ellsberg, 709 F.2d at 57 ("[T]he privilege may not be used to shield any material not strictly necessary to prevent injury to national security. . . ."). "Although classification may be an indication of the need for secrecy, treating it as conclusive would trivialize the court's role." Mohamed, 613 F.3d at 1082.

the court to determine whether the case can proceed without the privileged information.

Information that is properly privileged under the state secrets doctrine "is absolutely protected from disclosure--even for the purpose of in camera examination by the court." El-Masri, 479 F.3d at 306. The Supreme Court was explicit as to this point in Reynolds: "When . . . the occasion for the privilege is appropriate, . . . the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." 345 U.S. at 10.

Furthermore, "no attempt is made to balance the need for secrecy of the privileged information against a party's need for the information's disclosure; a court's determination that a piece of evidence is a privileged state secret removes it from the proceedings entirely." El-Masri, 479 F.3d at 306 (citing Reynolds, 346 U.S. at 11). "[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." Reynolds, 345 U.S. at 11.

As such, "[i]f a proceeding involving state secrets can be fairly litigated without resort to the privileged information, it may continue." El-Masri, 479 F.3d at 306. On the other hand, "a proceeding in which the state secrets privilege is

13

successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure."  Id. at 308 (citations omitted); see also Sterling, 416 F.3d at 347-48 ("We have long recognized that when 'the very subject of [the] litigation is itself a state secret,' which provides 'no way [that] case could be tried without compromising sensitive military secrets,' a district court may properly dismiss the plaintiff's case." (quoting Fitzgerald, 776 F.2d at 1243) (alterations in original)); Bowles v. United States, 950 F.2d 154, 156 (4th Cir. 1991) (per curiam) ("If the case cannot be tried without compromising sensitive foreign policy secrets, the case must be dismissed.").  "To be sure, dismissal is appropriate '[o]nly when no amount of effort and care on the part of the court and the parties will safeguard privileged material,'" Sterling, 416 F.3d at 348 (quoting Fitzgerald, 776 F.2d at 1244) (alteration in original); however, "dismissal follows inevitably when the sum and substance of the case involves state secrets," id. at 347.

We have identified three examples of circumstances in which the privileged information is so central to the litigation that dismissal is required.  First, dismissal is required if the plaintiff cannot prove the prima facie elements of his or her claim without privileged evidence.  See Farnsworth Cannon, Inc.

14

v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980) (en banc) (per curiam) ("[A]ny attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation."). Second, even if the plaintiff can prove a prima facie case without resort to privileged information, the case should be dismissed if "the defendants could not properly defend themselves without using privileged evidence." El-Masri, 479 F.3d at 309; see also Sterling, 416 F.3d at 347. Finally, dismissal is appropriate where further litigation would present an unjustifiable risk of disclosure. See El-Masri, 479 F.3d at 308 ("[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure.").

With these principles in mind, and "being cognizant of the delicate balance to be struck in applying the state secrets doctrine," El-Masri, 479 F.3d at 308, we proceed to our analysis of Abilt's claim.

III.

A.

The district court correctly found that the government satisfied each of the first two steps of the state secrets inquiry outlined by this Court in El-Masri. 479 F.3d at 304. The government satisfied the first step, the Reynolds procedural requirements, by submitting the declaration of John Brennan, in his capacity as the Director of the CIA, asserting the state secrets privilege after personal consideration of Abilt's claims and determining that the disclosure of information relating to "intelligence sources, methods, and activities that may be implicated by the allegations in the plaintiff's Amended Complaint . . . are at risk of disclosure in this case." J.A. 44. Furthermore, after a review of the public and classified declarations filed by Dir. Brennan in support of the invocation of the state secrets privilege, we are satisfied that the government has satisfied the Reynolds "reasonable danger" standard.[6] There is little doubt that there is a reasonable danger that if information the government seeks to protect from

---

[6] The district court held that collateral estoppel applies to the government's invocation of the state secrets privilege because the issues in this case are identical to the issues settled in Abilt I. Finding that the information is properly privileged regardless, we do not reach the collateral estoppel issue.

disclosure--information regarding the specific CIA programs on which Abilt worked; the identities of certain CIA officers; the job titles, duties, and work assignments of Abilt, his coworkers, and his supervisors; the criteria for making work assignments; the sources and methods used by the CIA; the targets of CIA intelligence collection and operations; the training preparations required to send a CIA officer overseas; and the location of CIA covert facilities--were revealed, that disclosure would threaten the national security of the United States. As such, it falls squarely within the ambit of the state secrets privilege.[7] Finding the information in question to be properly privileged, we necessarily "remove[ ] it from the proceedings entirely." See El-Masri, 479 F.3d at 306 (citing Reynolds, 345 U.S. at 11).[8]

---

[7] See, e.g., Sterling 416 F.3d at 346 (holding that "information that would result in . . . disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments falls squarely within the definition of state secrets" (alterations in original) (internal quotation marks omitted) (quoting Molerio v. F.B.I., 749 F.2d 815, 820–21 (D.C. Cir. 1984))); Mohamed, 614 F.3d at 1086 (holding that "information concerning CIA clandestine intelligence operations that would tend to reveal intelligence activities, sources or methods" is protected by state secrets privilege); Al-Haramain, 507 F.2d at 1204 (applying the state secrets privilege to "the means, sources and methods of intelligence gathering").

[8] Abilt does not reasonably contend that the information the government seeks to protect is not properly privileged. Although Abilt asserts that the district court erred in (Continued)

17

B.

Finding that the information is properly privileged, "the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim." El-Masri, 479 F.3d at 304.

Our analysis, then, properly begins with an examination of the information required to litigate Abilt's claims. See El-Masri, 479 F.3d at 308. Abilt brings two claims, one under the Rehabilitation Act for alleged disability discrimination and failure to accommodate, and another under Title VII for alleged retaliation for his EEO activities. Abilt may succeed on these claims either by presenting direct evidence of his superiors' discriminatory intent, or by proceeding under the burden shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). It appears, based on his briefs, that

---

determining "that there were no genuine issues of material fact that the agency properly invoked the state secrets privilege," Appellant's Br. 9, Abilt's brief fails to make any argument to support this assertion. Abilt's only argument regarding this issue is simply that the district court misstated his concession that the privilege applied and that "non-privileged information exists and/or can be discovered, which would enable the Appellant to support a prima facie case and enable Defendants to support a defense to Mr. Abilt's claims." Appellant's Br. 11 (emphasis in original). This, however, is an argument that the case may go forward under the third El-Masri step, not whether the privilege has been properly invoked. Accordingly, we address this argument in Section III.B.

18

Abilt is attempting to proceed under the McDonnell Douglas framework.

The McDonnell Douglas framework has been utilized to evaluate discrimination and retaliation claims under both Title VII and the Rehabilitation Act. See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57–58 (4th Cir. 1995). Under McDonnell Douglas, the plaintiff has the initial burden of proving his or her prima facie case by a preponderance of the evidence. Id. at 58. If the plaintiff succeeds, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. Id. Finally, once the defendant proffers its justification for the action, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas, 411 U.S. at 804).

Establishing each of the prima facie elements[9] of his claims without resort to privileged information is an extremely high

---

[9] To establish his prima facie claim of disparate treatment discrimination Abilt must show that: (1) he has a disability; (2) suffered a material adverse action; (3) was performing the essential functions of his position at a level that met his employer's legitimate expectations; and (4) the adverse action
(Continued)

19

hurdle given the facts of this case, one that the district court felt Abilt could not clear. However, even if we assume that Abilt can make his prima facie case, we find that our precedent nonetheless requires dismissal because any defense to these claims that the government could offer would undoubtedly rely on privileged information.

We have consistently upheld dismissal when "the defendants could not properly defend themselves without using privileged information" and the "main avenues of defense available" would require privileged information. El-Masri, 479 F.3d at 309-10 (finding dismissal proper because "virtually any conceivable response to El-Masri's allegations would disclose privileged information"); see also Sterling, 416 F.3d at 347. For instance, in Sterling, a covert employee filed a complaint against the CIA under Title VII alleging employment discrimination and retaliation. 416 F.3d at 341. Specifically, Sterling alleged that he was denied "advantageous opportunities, subjected . . . to disparate treatment, [was given work plans] that contained more rigorous requirements" than similarly

---

occurred under circumstances that raise a reasonable inference of unlawful discrimination. Ennis, 53 F.3d at 58. Likewise, in order to establish his prima facie case of retaliation, Abilt would need to show that he engaged in protected activity, that he was subject to an adverse employment action, and that there is a causal link between the two. See Laing v. Fed. Express Corp., 703 F.3d 713, 720 (4th Cir. 2012).

20

situated coworkers.  Id.  He also alleged retaliation for using the EEO process to report this alleged discrimination.  Although we found that Sterling could not make out his prima facie case, we reasoned that "[e]ven assuming Sterling were somehow able to manage the impossible feat of making out all the elements of a Title VII claim without revealing state secrets, further issues would remain" because the government would still be "entitled to present, as a defense to Sterling's prima facie case, legitimate nondiscriminatory reasons for its actions."  Id. at 347.  The evidence required to mount this defense, we explained, "would inescapably reveal the criteria inherent in sensitive CIA decisionmaking."  Id.

In the present case, even if Abilt establishes the prima facie case for either of his claims, the CIA is entitled to proffer a legitimate, non-discriminatory reason for its actions as a defense.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993).  Yet, based on the nature of Abilt's claims, virtually any reason the CIA could offer for its actions would require the disclosure of information about Abilt's performance as a covert operative, the nature of the jobs he sought, the requirements of those jobs, the job performance of his colleagues, and/or the criteria used by the CIA to make assignments.  Abilt's claims allege that his supervisor at the CIA canceled his temporary duty assignment to a warzone, denied

21

him other assignments and training opportunities available to his coworkers, and falsely reported that he was failing to satisfactorily perform his clandestine work assignments. Just as in Sterling, any explanation that the CIA could offer for these actions "would inescapably reveal the criteria inherent in sensitive CIA decisionmaking." 416 F.3d at 347.[10] This information is properly protected from disclosure, thus, dismissal is required.

Abilt points to the lower burden at step two of the McDonnell Douglas framework as evidence that the CIA can defend itself without resort to privileged information. See Burdine, 450 U.S. at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." (citations omitted)). However, even if the CIA enjoys a lower burden at step two of the McDonnell Douglas framework, its responsibilities do not end there. Under step three of the McDonnell Douglas analysis, "[t]he plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his [or her] own case and through cross-examination of the

_____

[10] Although Abilt attempts to distinguish Sterling on the grounds that he does not need comparator evidence to establish his prima facie case, the nature of the information required for the CIA to defend itself in the two cases is indistinguishable.

22

defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision." Hicks, 509 U.S. at 507-08 (quoting Burdine, 450 U.S. at 256). To be clear, even if the CIA could, as Abilt suggests, proffer a legitimate nondiscriminatory reason for its actions without resort to privileged information, in properly litigating that reason, Abilt would be entitled to probe deeper into the CIA's justifications "through cross-examination of the [CIA]'s witnesses." Id. In doing so, Abilt "would have every incentive to probe as close to the core secrets as the trial judge would permit." Farnsworth, 635 F.2d at 281. "Such probing . . . would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation." Id.

Abilt further contends that "the Agency does not need classified information to advance its defense" because "[a]ny argument that he could not perform his duties overseas or overseas in a warzone is contradicted by non-classified information." Appellant's Br. 22–23. However, the simple fact that Abilt believes he can show that the CIA's proffered non-discriminatory reasons for its actions are pretextual does not mean that the CIA is not entitled to present its justifications, or that we should ignore the fact that any such justification is

properly privileged. The CIA is entitled to proffer legitimate, nondiscriminatory reasons for its actions. If those reasons are properly privileged--as is the case here--then the case must be dismissed.

## C.

Abilt also argues that "protective measures," particularly in camera review, are adequate to protect the state secrets at issue here. To the contrary, this Court has held that an ex parte trial is "expressly foreclosed" by the Supreme Court's decision in Reynolds. El-Masri, 479 F.3d at 311. Indeed, "[i]nadvertent disclosure during the course of a trial--or even in camera--is precisely the sort of risk that Reynolds attempts to avoid. At best, special accommodations give rise to added opportunity for leaked information. At worst, that information would become public, placing covert agents and intelligence sources alike at grave personal risk." Sterling, 416 F.3d at 348.

Although Abilt points to procedures developed by the district court in Roule v. Petraeus, No. C 10-04632 LB, 2012 WL 2367873, at *7 (N.D. Cal. June 21, 2012), designed to "avoid presenting sensitive information," that case is easily distinguishable in that at the time of that court's decision, the government had not asserted the state secrets privilege.

24

Once the privilege has been asserted, we are obliged to evaluate that claim under the three-step analysis put forward by this Court in El-Masri, 479 F.3d at 304.  As explained above, those steps require dismissal.

D.

We acknowledge once again the unfortunate burden, on behalf of the entire country, that our decision places on Abilt.  See Sterling, 416 F.3d at 348 ("We recognize that our decision places, on behalf of the entire country, a burden on Sterling that he alone must bear."); El-Masri, 479 F.3d at 313 ("As we have observed in the past, the successful interposition of the state secrets privilege imposes a heavy burden on the party against whom the privilege is asserted.").  Abilt suffers dismissal of his claim "not through any fault of his own, but because his personal interest in pursuing his civil claim is subordinated to the collective interest in national security." El-Masri, 479 F.3d at 313; see also Fitzgerald, 776 F.2d at 1238 n.3 ("When the state secrets privilege is validly asserted, the result is unfairness to individual litigants-—through the loss of important evidence or dismissal of a case-—in order to protect a greater public value.").  We however find that "in limited circumstances like these, the fundamental principle of

25

access to court must bow to the fact that a nation without sound intelligence is a nation at risk." Sterling, 416 F.3d at 348.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.