# United States Court of Appeals
## For the First Circuit

No. 22-1052

SAKAB SAUDI HOLDING COMPANY,

Plaintiff, Appellant,

v.

SAAD KHALID S. ALJABRI; KHALID SAAD KHALID ALJABRI; MOHAMMED
SAAD KH ALJABRI; NEW EAST (US) INC.; NEW EAST 804 805 LLC; and
NEW EAST BACK BAY LLC,

Defendants, Appellees,

UNITED STATES,

Intervenor, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Gelpí, Howard, and Thompson,
Circuit Judges.

---

Michael J. Gottlieb, with whom M. Annie Houghton-Larsen and
Wilkie Farr & Gallagher LLP were on brief, for appellant.
Ian H. Gershengorn, with whom Lindsay C. Harrison, Jenner &
Block LLP, R. Robert Popeo, Scott C. Ford, and Mintz Levin Cohn
Ferris Glovsky and Popeo, P.C. were on brief, for appellees Saad
Khalid S. Aljabri and Khalid Saad Khalid Aljabri.
Faith E. Gay, Caitlin Halligan, Selendy Gay Elsberg PLLC,
Kevin P. Martin, Jaime A. Santos, and Goodwin Procter LLP on brief
for appellees Mohammed Saad Kh Aljabri, New East (US) Inc., New

East 804 805 LLC, and New East Back Bay LLC.

Lewis S. Yelin, Attorney, Appellate Staff, U.S. Department of Justice, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Rachael S. Rollins, United States Attorney, and H. Thompson Byron III, Attorney, Appellate Staff, U.S. Department of Justice, were on brief, for intervenor-appellee United States.

_____

January 27, 2023

_____

**THOMPSON, <u>Circuit Judge</u>.** We are called upon today to examine when ordinary legal procedures must yield to extraordinary ones for the greater good. In this case, a foreign counterterrorism corporation (our appellant) filed suit and sought an order freezing certain Massachusetts assets based on its allegations that a former government official perpetrated a massive fraud when he misappropriated billions of dollars from the corporation. The defendants to that suit (appellees here) seek to tell a very different tale in defense of these allegations: The funds were received lawfully in connection with clandestine counterterrorism and national security operations that sometimes were undertaken alongside the United States government. But to prove their story, the appellees say they'd need to divulge United States state secrets. Enter stage right: The United States government stepped in, asserted the state secrets privilege, and successfully got that information and, with it, a great deal of other information excluded from the case. And while the appellant insists the case can proceed nonetheless, and that it should be awarded the preliminary relief it seeks notwithstanding the exclusion of the privileged materials, the appellees are just as insistent the case cannot be litigated and thus obligates dismissal because they cannot fairly defend themselves without relying on the privileged materials.

The district court concluded it could not tackle the necessary inquiries to examine the claims and defenses or award the preliminary equitable relief the appellant sought without weighing the privileged information and risking disclosure of state secrets. Consequently, the district court determined the case could not be adjudicated and dismissed the suit.

As we explain below, we affirm.

**BACKGROUND**

The facts and procedural history of this matter are something of a global affair. Bear with us as we tell the story that paves the way to the issues presented for our appellate review.

<u>Players, Places, Suits, and Proceedings</u>

The appellant is Sakab Saudi Holding Company ("Sakab"), an entity that bills itself as a creation of the Kingdom of Saudi Arabia ("KSA") that "perform[s] anti-terrorism activities in the public interest" and is funded by the KSA's Ministry of Finance. And the appellees are Saad Khalid S. Aljabri ("Aljabri"), a former high-ranking KSA government official who was engaged in counterterrorism and intelligence work, and his sons, Khalid Saad Khalid Aljabri and Mohammed Saad Kh Aljabri (we'll refer to Aljabri and his sons as "the Aljabris"). Together, the Aljabris are managers or directors of New East (US) Inc., New East 804 805 LLC,

and New East Back Bay LLC (collectively, "New East" and, all together with the Aljabris, "Appellees," who filed a joint brief).

The case now before us has its genesis in Canada, where Aljabri lives and where, on January 22, 2021, Sakab sued Appellees (and some others not involved in the instant matter). In Ontario Superior Court, Sakab alleged, inter alia, that Aljabri defrauded Sakab of billions of dollars, having used a variety of unauthorized payments and transfers to do so. Sakab supported its allegations with a dense forensic accounting report. Sakab immediately and successfully sought an interlocutory order freezing the Aljabris' assets worldwide (a Mareva injunction, see Grupo Mexicano de Desarollo v. Alliance Bond Fund, Inc., 527 U.S. 308, 327-29 (1999)), and the Canadian court also appointed a receiver for certain assets. Litigation in Ontario is ongoing.

Sakab then looked southward to Massachusetts, filing a March 24, 2021 state court complaint "to give effect to" the Ontario court's freezing and receivership orders relative to the Aljabris' Massachusetts properties. The ten-count complaint offers state law claims for breach of fiduciary duty (Count I), fraud (Count II), fraudulent misrepresentation (Count III), fraud by omission (Count IV), conversion (Count V), conspiracy (Count VI), aiding and abetting (Count VII), unjust enrichment (Count VIII), fraudulent transfer (Count IX) and alter ego/piercing corporate veil (Count X). In it, Sakab alleges, as it did in

- 5 -

Ontario, that Aljabri perpetrated a massive fraud on it, "us[ing] Sakab as a vehicle to distribute funds that had been allocated for anti-terrorism activities . . . to himself" and others -- specific to Massachusetts, the complaint alleges the proceeds of this fraudulent scheme were used to acquire $29 million worth of Massachusetts properties. And Sakab says those fraudulently obtained funds have since been distributed to various companies, including New East, and also have been used to purchase real estate in Massachusetts and beyond. So, Sakab says, the complaint was filed "to preserve the fruit of the Fraudulent Scheme now located in Massachusetts that is subject to the Ontario Orders." Sakab also filed motions for the preliminary attachment of properties in Massachusetts, memoranda of lis pendens, and a motion to stay the proceedings pending the outcome in the Ontario case.

Appellees swiftly removed the action to Massachusetts federal district court, citing the case's implication of federal interests. In so doing, Appellees denied any fraudulent wrongdoing by Aljabri, insisting the funds in question were lawfully received. According to Appellees, Aljabri, in his capacity as a government official under former Saudi Crown Prince Mohammed bin Nayef, helped the Saudi government establish Sakab with "the primary purpose of funding and undertaking clandestine and sensitive operations in partnership with the United States Government." Adjudicating Sakab's claims, Appellees said, would require the district court

to consider whether certain of Aljabri's activities, like "covert counterterrorism operations in partnership with the United States Government, constituted fraud, breach of fiduciary duty, or conversion under the law of Saudi Arabia." As a direct result, the district court would need to examine the financing of "sensitive programs operated in partnership" with U.S. intelligence agencies. Thus, knowing the district court would have to scrutinize "a partnership between the government of Saudi Arabia and the intelligence and national security agencies of the United States Government" to assess the claims and defenses in the case, Appellees told the court the suit clearly raised "substantial federal issues."

Sakab moved in April 2021 to send the case back to state court, arguing that the only point of the Massachusetts case was "to obtain prejudgment relief on the basis of comity to the Ontario Orders . . . and then to stay the Massachusetts Action." A few weeks later, the United States government noticed its potential participation in the action, and on August 3, 2021, the government, without taking any position on the merits of the case, formally moved to intervene -- a move Appellees supported but Sakab opposed. Mindful that any further briefing would run the risk of revealing state secrets, the government also moved to stay briefing on the motion to remand.

About a week later, Aljabri filed an answer to the Massachusetts complaint in which he not only denied the ten counts against him, but also asserted affirmative defenses and raised counterclaims against Sakab.[1]  Throughout his filing, Aljabri acknowledged his receipt of funds from Sakab, but insisted they were lawfully received, and any off-the-book transactions were off-the-book simply because of the transactions' covert purposes and necessarily secretive nature.  He raised the specter of his inability to effectively litigate the case -- to prove his defenses and counterclaims -- without relying on information he believed would be deemed privileged (and thus unavailable to him in the litigation).

## The Privilege Assertion

On August 23, 2021, Avril Haines, the Director of National Intelligence ("the Director"), asserted the state secrets privilege and a statutory privilege pursuant to 50 U.S.C. § 3024(i)(1) "to protect certain classified national security information . . . at risk of disclosure" in the Sakab case.  Indeed,

---

[1]  The answer laid out eighteen affirmative defenses, including, for example:  failure to state a claim; statute of limitations problems; waiver; laches; estoppel; and immunity.  The answer also asserted three counterclaims against Sakab.  Those counterclaims sought:  1) declaratory judgment that the allegedly fraudulent transactions were actually legal; 2) declaratory judgment that Sakab is not entitled to enforce the Mareva injunctive relief in Massachusetts; and 3) judgment against Sakab for abuse of civil process.

having reviewed the matter, the Director, "as head of the [U.S. Intelligence Community]," explained that such disclosure "reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States and, accordingly, that this information must be protected and excluded from use in this case."

Couching her assertion of the privilege "[i]n general and unclassified terms," the Director broadly asserted the state secrets and statutory privileges as to

> information concerning sources, methods, capabilities, activities, or interests of the [U.S. Intelligence Community], as well as information that might tend to reveal or disclose the identities of U.S. Government employees, affiliates, or offices with whom one or more of the parties or the Kingdom of Saudi Arabia may have had certain interactions and the disclosure of which would be damaging to U.S. national security interests.

This description, the Director explained, was "intended to specifically include information known to [Aljabri] about such matters that he seeks to introduce or disclose in this action, whether through documents, testimony, affidavits, or declarations, as part of his response and defense to pending claims and motions."

But because "the complete factual basis for [this] privilege assertion [could not] be set forth on the public record without revealing the very information that [the Director was seeking] to protect and without risking the very harm to U.S. national security that [the Director sought] to prevent," the

government submitted for the district court's in camera, ex parte review classified declarations regarding the claim of state secrets. The declarations, according to the Director, "further describe the categories of information over which [she was] asserting privilege and explain that the unauthorized disclosure of this classified information, in this litigation or otherwise, reasonably could be expected to result in serious, and in some cases exceptionally grave, damage to our national security." "[S]uch harms," she wrote, "include the disclosure of information that would enable foreign adversaries to evade, undercut, negate, or otherwise impede critical national security and foreign policy objectives of the United States." The Director requested that the court "take all necessary steps to protect" the "classified and privileged intelligence information" she had just described.

As the district court would later note, those declarations -- their contents, who swore them, and so on -- "cannot be described in greater detail without risking public disclosure of the highly classified information contained therein." Sakab Saudi Holding Co. v. Aljabri, No. 21-10529-NMG, 2021 WL 8999588, at *2 (D. Mass. Oct. 26, 2021) [hereinafter Sakab I]. Having also reviewed the declarations,[2] this court agrees and will say no more by way of description.

---

[2] The classified record was made available to us by the government for our in camera, ex parte review.

On the basis of the Director's declaration and the classified declarations, the government asked the district court to accept the privilege assertion and excise the privileged information from the Sakab case. In doing so, the government took "no position on whether [the] invocation of privilege should result in the dismissal of any aspect of this lawsuit."

### The Proposed Protective Order

In the days following the Director's assertion of the privilege, and still without taking any position on the merits of the case, the government on August 27, 2021 moved for a protective order "to establish procedures to protect against the risk of disclosure in further proceedings" by, inter alia, requiring all proposed filings be run by the government prior to submission to the court. Appellees opposed the protective order request, urging that the "exclusion of the extraordinarily broad category of information" would prove "insurmountab[ly] challeng[ing] to" Appellees' ability to prove their defenses. So Appellees requested that the district court modify the proposed protective order to allow Appellees to explain "why the case should be dismissed." In particular, echoing some of the statements made in their answer and counterclaims, Appellees urged that the big question in the case was whether Aljabri received money from Sakab fraudulently or legally, and getting to the bottom of that would necessitate an "examination of the programs and operations [Aljabri] was

- 11 -

compensated for leading or overseeing, how those programs and operations were funded, [and] why the funding in some cases may have been especially opaque." According to Appellees, it was inescapable that any litigation stemming from these issues would require scrutiny of privileged materials, to wit, "information concerning . . . activities, or interests of the [U.S. Intelligence Community]."

But the government opposed Appellees' requested adjustments to the proposed order, asserting that any motion to dismiss that contained privileged information would simply be too "harmful to the national security interests of the United States." And, the government posited, if the privilege assertion was valid -- resulting in the exclusion of the privileged materials -- Appellees would then be able to argue, "without actually using th[e] privileged information in [a] motion," that the privileged information was needed to prove their defense.

Sakab responded by moving for what it styled as a procedural order, seeking to shepherd for review its motions for prejudgment attachment, lis pendens, and a subsequent stay of the case pending the outcome of the Ontario action. According to Sakab, there would be no need for privileged information and no risk to national security interests if the district court would simply grant Sakab preliminary relief on the basis of comity to Ontario's court orders.

Initial jockeying complete, it was time for the district court to weigh in.

## District Court Rulings

All told, the pending motions and issues ripe for the district court's resolution come October 2021 were these: whether the government should be allowed to intervene; if permitted to intervene, whether the government's privilege assertion was a valid one; and whether the matter should be remanded to state court, as Sakab requested.

In fielding these queries, the district court: granted the government's motion to intervene, finding the government's "interest in preventing the disclosure of state secrets [was] obvious and uncontested," see id. at *2-3; concluded the assertion of privilege was valid, see id. at *3; and, in light of the clear "embedded" federal issues, declined to remand to state court, see id. at *5-7.[3]

The court did something else, too. It directed Sakab to show cause as to why the case shouldn't be dismissed "in light of the accepted assertion of the state secrets privilege," which rendered Appellees unable to "fairly defend themselves" against the allegations of fraud without resorting to the off-limits privileged information.[4] Id. at *4.

---

[3] On appeal, Sakab does not contest any of these conclusions.

[4] The district court also held under advisement the

- 13 -

Sakab did not dispute the district court's conclusion that the assertion of privilege was valid. Rather, in its November 9, 2021 show-cause filing, Sakab argued that the district court could award Sakab the relief it wanted -- a prejudgment attachment and lis pendens as to the Massachusetts properties, plus the stay -- without any need to evaluate the privileged materials or even litigate the case on its merits. Sakab pointed to comity to the Ontario litigation's orders to carry its burden to get that prejudgment-attachment relief, requesting an opportunity to brief the notion further. Sakab also asserted that it would be premature to dismiss the case when Appellees hadn't shown any deprivation of a valid defense, nor had they shown the privileged information was necessary for a "valid" defense (according to Sakab, a defense that is "meritorious" or "dispositive"). In Sakab's telling, to determine that a defense is "valid," a court must conduct an "appropriately tailored in camera review" of the excluded privileged information, and that didn't happen here. On top of all of this, Sakab asseverated, Appellees had been able to raise some substantive defenses in the Ontario litigation without resorting to privileged information, so surely the same could be achieved here.

---

government's protective-order motion "pending consideration of [Sakab]'s show cause pleading." Sakab I, 2021 WL 8999588, at *7.

- 14 -

Many of these arguments were repeated and probed at a hearing before the district court. After the hearing, the district court accepted Sakab's supplemental papers wherein Sakab argued for a lis pendens to encumber the subject properties, which Sakab urged it was entitled to and would avoid any risk of disclosing privileged materials. Appellees responded that a lis pendens was not an option as a matter of law and, regardless, wouldn't even avoid litigation on the merits.

The district court dismissed the case. See Sakab Saudi Holding Co. v. Aljabri, 578 F. Supp. 3d 140, 143 (D. Mass. 2021) [hereinafter Sakab II]. The district court was not persuaded by Sakab's contention that the court could grant Sakab a prejudgment attachment order without evaluating the merits of Sakab's claims against Appellees and, by the same token, the merits of Appellees' listed defenses. Id. at 144. Observing that Rule 64(a) of the Federal Rules of Civil Procedure permits a court to enter an order seizing property to cover a potential judgment when that remedy is authorized by state law, id. at 143-44, the district court then explained that Massachusetts law makes "[a] showing of reasonable likelihood of success on the merits . . . a prerequisite for attachment," id. at 144 (citation omitted). From there, the district court concluded Sakab couldn't establish a reasonable likelihood of success by relying on the Ontario court's interim order. Id. Instead, Sakab needed to establish a reasonable

likelihood of success on its fraud and other claims in the Massachusetts action -- but it could not do so unless the court considered the excluded privileged information.  Id.

And the district court next explained that it could not avoid adjudicating the merits of Sakab's case by entering a lis pendens notice and staying the action.[5]  Id. at 145.  A lis pendens notice "provides notice that property is the subject of a pending action" and "is derivative of the underlying claims," but "the underlying proceeding to which the lis pendens would refer consists of ten claims which the Court has determined must be dismissed." Id.

Because the district court determined it could not grant Sakab its requested relief, id. at 144, 146, and having already determined Appellees could not fairly defend themselves on the merits without relying on the privileged information, Sakab I, 2021 WL 8999588, at *4; see also Sakab II, 578 F. Supp. 3d at 143, the court dismissed the case, Sakab II, 578 F. Supp. 3d at 146.[6]

_____

[5] The district court construed Sakab's post-hearing supplemental memorandum of law as a motion to record a lis pendens. See Sakab II, 578 F. Supp. 3d at 145 n.1.

[6] The district court also noted that, since the "privileged material is similarly pertinent to Aljabri's first counterclaim it, too," had to be dismissed; but the court didn't reach "the merits of [Appellees'] two remaining counterclaims which [it] dismissed without prejudice." Sakab II, 578 F. Supp. 3d at 143. To close the matter out, the court also denied as moot the government's motion for a protective order.  Id. at 145-46.

- 16 -

Sakab timely appealed, challenging the dismissal and rejections of its preliminary relief requests.

## DISCUSSION

The stage set, we proceed to our de novo review of the district court's legal determinations concerning the effect of a successful assertion of the state secrets privilege.  See Mohamed v. Jeppesen Dataplan, Inc., 614 F.3d 1070, 1077 (9th Cir. 2010) (en banc); El-Masri v. United States, 479 F.3d 296, 302 (4th Cir. 2007).  It is well established that "we may affirm the dismissal of a complaint 'on any basis available in the record.'"  Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 30 (1st Cir. 2020) (quoting Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013)); see also Williams v. United States, 858 F.3d 708, 714 (1st Cir. 2017) ("As always, we are also free to affirm on any basis apparent in the record, even if it would require ruling on arguments not reached by the district court or even presented to us on appeal.") (internal quotations and brackets omitted).

There is a tripartite inquiry courts must undertake when a state secrets question arises:  first, make sure that the government has followed the proper procedure in making a formal claim of privilege; then, figure out whether the information purportedly covered by the privilege assertion does in fact qualify as privileged; and finally, sort out how -- if at all -- the case should proceed given the successful assertion of the state secrets

privilege.  See Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv., 14 F.4th 276, 302 (4th Cir. 2021) [hereinafter Wikimedia] (first citing El-Masri, 470 F.3d at 304; and then United States v. Reynolds, 345 U.S. 1, 10 (1953)), petition for cert. filed, No. 22-190 (U.S. Aug. 26, 2022).

In the instant matter, there is no debate about the first two components of this inquiry.  Rather, the critical question here is all about that final query:  whether this matter should proceed in light of the privilege claim.  Id.

Sakab says of course its suit can proceed notwithstanding the privilege assertion, offering a variety of arguments in its effort to persuade us we should resuscitate the case, or at least grant it prejudgment attachment, a lis pendens recording, and a subsequent stay of the case (because, as Sakab has maintained all along, these forms of preliminary relief don't even turn on an ability to actually litigate the case in Massachusetts).  But before we lay out and drill down on Sakab's contentions, because the outcome of the appeal substantially depends on the overall viability of the underlying suit, we must start by answering this overarching question:  Given the assertion of the state secrets privilege, can litigation of this suit proceed?

The answer is no.  To explain why, we will first explore the foundational standards and precedent that inform our analysis,

then use that to assess the functional, sweeping consequences of the government's assertion of privilege on this case. Along the way, we'll probe why each of Sakab's various proffers falls short of persuading us that dismissal is not required. Then we'll explain why Sakab has not demonstrated that it is entitled to any preliminary relief.

### State Secrets: Guiding Principles

> Many of the Government's efforts to protect our national security are well known. It publicly acknowledges the size of our military, the location of our military bases, and the names of our ambassadors to Moscow and Peking. But protecting our national security sometimes requires keeping information about our military, intelligence, and diplomatic efforts secret.

Gen. Dynamics Corp. v. United States, 563 U.S. 478, 484 (2011).

The state secrets privilege, "an evidentiary rule 'bas[ed] in the common law of evidence,'" Wikimedia, 14 F.4th at 294 (quoting El-Masri, 479 F.3d at 304), "permits the Government to prevent disclosure of information when that disclosure would harm national security interests," United States v. Zubaydah, 142 S. Ct. 959, 967 (2022).[7] Indeed, as the high Court has said, "the privilege applies where 'there is a reasonable danger that compulsion of the evidence will expose military matters which, in

---

[7] For more on the state secrets doctrine's policy points and an explanation of its evidentiary roots, the curious reader should consult in full Reynolds, 345 U.S. at 6-7, which has been described as the case that "established the doctrine in its modern form," El-Masri, 479 F.3d at 302.

the interest of national security, should not be divulged.'" Fed. Bureau of Investigation v. Fazaga, 142 S. Ct. 1051, 1061 (2022) (quoting Reynolds, 345 U.S. at 10); see also Gen. Dynamics Corp., 563 U.S. at 484 (observing that the privilege serves the "sometimes-compelling necessity of governmental secrecy" over "military, intelligence, and diplomatic" information).

This "expansive and malleable" privilege can apply to different types of state secrets, such as materials and information that could, if made public, disclose our intelligence communities' information-gathering methods and/or capabilities, impair our country's defenses, and "disrupt[] . . . diplomatic relations with foreign governments." Ellsberg v. Mitchell, 709 F.2d 51, 57 (D.C. Cir. 1983). Indeed, even if a party has made a "strong showing of necessity" for the discovery or use of such information, Reynolds, 345 U.S. at 11, the state secrets privilege still applies in the face of "a reasonable danger" that the disclosure of the evidence in question would harm our national-security interests, Fazaga, 142 S. Ct. at 1061 (quoting Reynolds, 345 U.S. at 10); see also Reynolds, 345 U.S. at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake.").

Now, in the instant matter, as we know, the district court concluded the government's privilege assertion was properly interposed as a matter of procedure, and the information it covered

was indeed privileged. Sakab I, 2021 WL 8999588, at *3 ("[T]he government's assertion of the state secrets privilege is procedurally proper and validly taken."). That conclusion had the effect of completely excising the privileged material from the case. See Wikimedia, 14 F.4th at 302-03 (explaining that, "[o]nce a court determines that certain facts are state secrets, they are 'absolutely protected from disclosure,'" and there can be "no attempt . . . to balance the need for secrecy of the privileged information against a party's need for the information's disclosure'" (quoting El-Masri, 479 F.3d at 306)); Al-Haramain Islamic, Inc. v. Bush, 507 F.3d 1190, 1204 (9th Cir. 2007) (reasoning that "[t]he effect of the government's successful invocation of privilege 'is simply that the evidence is unavailable, as though a witness had died'" (quoting Ellsberg, 709 F.2d at 64)).

As mentioned above, this is where that pivotal final part of the tripartite inquiry kicks in: What happens to a case in the wake of a successful assertion of the state secrets privilege? Well, "[i]f a proceeding involving state secrets can be fairly litigated without resort to the privileged information, it may continue." Wikimedia, 14 F.4th at 303 (quoting El-Masri, 479 F.3d at 306). But "if 'any attempt to proceed will threaten disclosure of the privileged matters,'" id. (quoting El-Masri, 479 F.3d at 306 (cleaned up)) -- if "the circumstances make clear that

- 21 -

privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure," El-Masri, 479 F.3d at 308, and "maintenance of [the] suit" would risk disclosure, Mohamed, 614 F.3d at 1077, 1089 (quoting Totten v. United States, 92 U.S. 105, 107 (1875)) -- then dismissal is not only appropriate, but necessary, El-Masri, 479 F.3d at 308. Indeed, "[t]he Supreme Court has recognized that some matters are so pervaded by state secrets as to be incapable of judicial resolution once the privilege has been invoked." El-Masri, 479 F.3d at 306 (citing Totten, 92 U.S. at 107; Reynolds, 345 U.S. at 11 n.26).

Some situations that have required dismissal include those where: "the very subject matter of the action" (an espionage agreement being the oft-cited illustration) is a "matter of state secret," Reynolds, 345 U.S. at 11 n.26; a plaintiff cannot prove the prima facie elements of a claim without the use of privileged evidence; even supposing a plaintiff can make out a prima facie case without resort to privileged information, "the defendants could not properly defend themselves without using privileged evidence"; and any "further litigation would present an unjustifiable risk of disclosure," Wikimedia, 14 F.4th at 303

(quoting Abilt v. Central Intelligence Agency, 848 F.3d 305, 313-14 (4th Cir. 2017)).[8]

With these foundational guideposts laid out, "cognizant of the delicate balance to be struck in applying the state secrets doctrine," El-Masri, 479 F.3d at 308, we turn to our review.

### Dismissal as a Consequence of the State Secrets Privilege Assertion

Our de novo review confirms that the district court was correct:  Litigation of this case cannot proceed in the wake of the government's assertion of the state secrets privilege, and thus dismissal was necessary.  Sakab urges otherwise, and we'll get to that, but as an initial matter, it is apparent to us that the privileged information is so central to this case that any

---

[8] The El-Masri court elaborated:

Although Totten has come to primarily represent a somewhat narrower principle -- a categorical bar on actions to enforce secret contracts for espionage -- it rested . . . on the proposition that a cause cannot be maintained if its trial would inevitably lead to the disclosure of privileged information. See 92 U.S. at 107.  And in Reynolds, while concluding that dismissal was unnecessary because the privileged information was peripheral to the plaintiffs' action, the Court made clear that where state secrets form the very subject matter of a court proceeding, as in Totten, dismissal at the pleading stage -- "without ever reaching the question of evidence" -- is appropriate. See 345 U.S. at 11 n.26.

479 F.3d at 306.

attempt to proceed with litigation of the suit would unduly risk disclosure and thereby compromise our national security. We explain, parrying Sakab's unavailing arguments and rejoinders as we go.[9]

---

[9] As a threshold matter, Sakab takes aim at the district court's "rush to dismiss this action," deploying the "extreme remedy" of sua sponte dismissal. (Sakab links its sua-sponte related grievances in part to the protective order as a readily available alternative to dismissal, but we'll talk about the protective order later.)

Sakab is right that no formal dispositive motion had been docketed. To Appellees' way of thinking, and the district court's for that matter, that was a symptom of the larger problem presented by the privilege assertion: Appellees represented they were unable to comprehensively buttress a motion to dismiss. See Sakab II, 578 F. Supp. 3d at 143 (recapping that the show-cause directive was issued "[i]n response to [Appellees'] concerns that they cannot fairly defend themselves (or even substantiate a motion to dismiss) without recourse to privileged material"). Based on its own review and analysis, the district court, having gone through the first parts of the above-described tripartite test, Sakab I, 2021 WL 8999588, at *3-4, indicated dismissal seemed likely, but in a thorough and notice-imbued move, the court afforded Sakab the opportunity to explain why the case could go forward notwithstanding that lay of the land, id. at *4. After receiving that initial show-cause briefing, the court went further: It heard detailed arguments from Sakab, Appellees, and the government. It even allowed Sakab to file supplemental post-hearing papers before ultimately dismissing the case. So while it's true the dismissal did not flow from a dispositive motion, this wasn't the sort of "strong medicine" sua sponte dismissal our case law warns about. Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 7 (1st Cir. 2007) ("The general rule is that in limited circumstances, sua sponte dismissals of complaints under Rule 12(b)(6) are appropriate, but that such dismissals are erroneous unless the parties have been afforded notice and an opportunity to amend the complaint or otherwise respond.") (cleaned up). Rather, it was the natural result of the district court's close adherence to what the precedent demands in this sort of state secrets case, which dictated that dismissal would be the next step if further litigation would run afoul of the above-described principles. See Wikimedia, 14 F.4th at 302-03.

As the precedent shows, when the state secrets privilege is successfully interposed over information that is so central to the case that any further litigation presents too much risk of exposure of that information, the case must not go on. Here, as Appellees argue, the privileged information (as covered in the government's remarkably sweeping privilege assertion) forms the basis of the factual disputes in this case, so the case cannot be fairly litigated, and any attempt to do so would risk disclosure of state secrets. They are correct.

Courts should dismiss a state secrets case, even at the pleadings stage, see Fazaga, 142 S. Ct. at 1062 (observing that "the state secrets privilege . . . sometimes authorizes district courts to dismiss claims on the pleadings"), when "the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure," Abilt, 848 F.3d at 313 (quoting El-Masri, 479 F.3d at 308); Mohamed, 614 F.3d at 1079 (cautioning that dismissal is necessary when litigation "would present an unacceptable risk of disclosing state secrets"); see also In re Sealed Case, 494 F.3d 139, 153 (D.C. Cir. 2007) [hereinafter Sealed Case] (reasoning that if "the subject matter of a case is so sensitive that there is no way it can be litigated without risking national secrets, then the case must be dismissed"). Critically, "[t]he controlling inquiry is not whether the general subject

matter of an action can be described without resort to state secrets. Rather, we must ascertain whether an action can be litigated without threatening the disclosure of such state secrets." El-Masri, 479 F.3d at 308. And "[t]hus, for purposes of the state secrets analysis, the 'central facts' and 'very subject matter' of an action are those facts that are essential to prosecuting the action or defending against it." Id.

Recall that the privilege assertion here covered "information concerning sources, methods, capabilities, activities, or interests of the [U.S. Intelligence Community]," plus "information that might tend to reveal or disclose the identities of U.S. Government employees, affiliates, or offices with whom one or more of the parties or the [KSA] may have had certain interactions and the disclosure of which would be damaging to U.S. national security interests." This is not a narrow interposition of privilege. Cf. Wikimedia, 14 F.4th at 282 (privilege assertion covered certain categories of information concerning a surveillance system used by the National Security Agency); Sealed Case, 494 F.3d at 153 (privilege was interposed over certain portions of two internal government reports). This privilege assertion covers a wide swath of information -- and was "intended to specifically include information known to [Aljabri] about such matters that he seeks to introduce or disclose in this action, whether through documents, testimony, affidavits, or

declarations, as part of his response and defense to pending claims and motions."

Now recall that the basic theory of Sakab's case is that Aljabri misappropriated massive sums of money from Sakab, and Appellees say the allegedly fraudulent transactions were actually legitimate, directed by the then-leadership of the KSA and made in connection with Aljabri's work on sensitive operations with, or at least alongside, the U.S. Intelligence Community. So, if the case were to proceed, the facts critical to its litigation and adjudication would center on getting to the bottom of those transactions and their nature. To that end, the parties would be seeking, inter alia, evidence about Aljabri's role and relationships with U.S. agencies, the degree of Aljabri's authority, how he participated in the programs and operations, who else was involved, the existence and execution of the operations themselves, who authorized and paid for them, and who then directed payment to or through Aljabri -- not to mention the whens, wheres, whys, and inverses of any of these things.

All of this is suffused with sensitive information, and discovery of any of this cannot be undertaken without risking disclosure of information that has been swept into oblivion by the incredibly broad privilege assertion. See, e.g., El-Masri, 479 F.3d at 309 ("Even marshalling the evidence necessary to make the requisite showings would implicate privileged state secrets,

because El-Masri would need to rely on witnesses whose identities, and evidence the very existence of which, must remain confidential in the interest of national security."); see also Mohamed, 614 F.3d at 1087 (finding dismissal was required "because there [was] no feasible way to litigate [the] alleged liability without creating an unjustifiable risk of divulging state secrets"); Sterling v. Tenet, 416 F.3d 338, 347-49 (4th Cir. 2005) (affirming dismissal at the pleading stage when the facts central to the action's litigation consisted of state secrets, noting that "the very methods by which evidence would be gathered in this case are themselves problematic"). Indeed, all of this information comprises the "central facts" of the action, i.e., "facts that are essential to prosecuting the action or defending against it." El-Masri, 479 F.3d at 308. The district court was right when it observed as much. See, e.g., Sakab I, 2021 WL 8999588, at *2 (stating that "the disposition of this matter threatens th[e government's] interest" in preventing disclosure of state secrets, and "[n]otwithstanding [Sakab]'s request for a disposition without consideration of the merits, the subject matter of [this] action for fraud is [Appellees'] property and transactions which implicate the state secrets claim asserted by the government").

This dynamic is compounded by the fact that, as both Appellees and the government point out, "both sides have an

incentive to probe up to the boundaries of state secrets" -- or even beyond. Gen. Dynamics Corp., 563 U.S. at 487. Indeed, we're mindful that when parties "have every incentive to probe dangerously close to the state secrets themselves," it's possible that "state secrets could be compromised even without direct disclosure." Fitzgerald v. Penthouse Intl'l, Ltd., 776 F.2d 1236, 1243 & n.10 (4th Cir. 1985) ("For example, if a witness is questioned about facts A and B, the witness testifies that fact A is not a military secret, and the government objects to any answer regarding fact B, by implication one might assume that fact B is a military secret."). It is all too easy to envision discovery and trial scenarios in which each side would press for information, documents, or answers to questions (perhaps posed to "witnesses with personal knowledge of relevant [state] secrets," id.) that flirt with the boundaries of the state secrets privilege here. With this privilege assertion being so broad, the parties would crash into its outer limits with nearly every propounded discovery request or deposition question, not to mention the risks of probing things at trial.

Sakab suggests that some of this information would be discoverable without running afoul of the privilege's bounds or that it could be disentangled from that which is privileged. Sakab complains that no one has even tried to litigate what, exactly, could be litigated, so that litigation could proceed on an

unprivileged record. But such a feat is impossible on the facts of a case like this, with a very broad privilege assertion and a complaint that centers on conduct and events awash in privileged secrecy. Even an attempt to do what Sakab is asking could risk disclosure.[10] This is the whole point. All of the pertinent information is simply too entwined, and (emphasis ours) "any attempt to proceed [with litigation would] threaten disclosure of the privileged matters." Wikimedia, 14 F.4th at 303 (quoting El-Masri, 479 F.3d at 306 (cleaned up)); see also Mohamed, 614 F.3d at 1088; El-Masri, 479 F.3d at 308-09.

Sakab would have us fault the district court for neglecting to isolate the privileged information from that which is public and discoverable. But the district court was not permitted to disentangle the information here, certainly not after it had already deemed the privilege assertion valid (and nobody objected to that conclusion). Remember, a district court can look to any evidence it deems necessary when it is trying to figure out whether the information at issue encompasses state secrets, "[b]ut after a court makes that determination, the privileged evidence is excised from the case," Wikimedia, 14 F.4th at 303, like a witness died, Al-Haramain, 507 F.3d at 1204, and (emphasis ours) "not even

---

[10] Sakab also urges, without citation, that dismissal isn't appropriate in the face of litigation that "merely risks (rather than requires) disclosure." Our above discussion of the precedent amply refutes this.

the court may look at such material in camera" after that, Wikimedia, 14 F.4th at 303 (collecting cases). So at this juncture, the evidence cannot be evaluated ex parte and in camera to disentangle it. See Sterling, 416 F.3d at 348, 349 (explaining that a court is "neither authorized nor qualified to inquire further" into privileged matters -- "even in camera").

And in any event, even if some non-privileged evidence could have been extracted for use in litigation, recall that litigants must be able to do more than just discuss a case in general terms -- they need to have access to the information necessary to actually litigate the case. See El-Masri, 479 F.3d at 310; see also, e.g., Wikimedia, 14 F.4th at 303-04 (observing that "'it would be a mockery of justice . . .' to permit Wikimedia to substantiate its claims by presenting its half of the evidence to the factfinder as if it were the whole" (quoting Sealed Case, 494 F.3d at 148)). Whether some facts can be set forth without revealing state secrets -- and perhaps that has been the case to some extent here -- isn't our inquiry.[11] The point is that the

_____

[11] Sakab maintains that litigation is possible here because Appellees have been "freely litigating" in the Ontario matter without reference to confidential information. We have a few issues with this argument and its premise, though. For one thing, it's not at all clear that Appellees have been able to do as much as they'd like by way of defense in that suit or otherwise meaningfully and fully litigating it since the same state-secrets obstacle presents in Canada. The attendant barriers to litigation presented here appear to be in play there too. Our appellate record suggests the Ontario case has not proceeded to discovery

essential factual questions central to the resolution of <u>this</u> case can't be fairly litigated without unduly threatening disclosure of state secrets.  <u>See</u> <u>El-Masri</u>, 479 F.3d at 308.

Related to its "disentangle the secret materials" proposition, Sakab urges that the government's proposed protective order was a perfectly viable alternative to dismissal.  According to Sakab, the district court should have just safeguarded the sensitive materials using the government-approved protective order and proceeded with litigation from there.[12]

_____

yet, and, just as they've argued here, Appellees have argued in Canada that the case shouldn't proceed because of state secrets. In fact, last we knew, Canada's Federal Court had undertaken proceedings to determine whether Appellees' evidence is privileged, the outcome of which will impact the course of the Ontario litigation.  The parties appear to be in a holding pattern while that process plays out.

Moreover, it's somewhat beside the point that Appellees may or may not be saying "more" or enough to defend in Canada, as Sakab asserts; the inquiry we're presented with is whether the case can be litigated <u>here</u>.  Our government's privilege assertion is in full force and effect in the matter before us, and that's what everyone (us included) is up against here.

[12] On the topic of the protective order, Sakab posits that the government advised against dismissal as premature and "propos[ed] to move forward with the litigation" of Sakab's case under the proposed protective order.  The record before us is clear:  The government did not advise against dismissal, and in floating its proposed protective order, it took no position on the propriety of dismissal.  Both below and before this court, the government has consistently taken no position on whether the successful privilege assertion means the case should be dismissed (or on the impact of the privilege on the preliminary relief Sakab seeks, for that matter).  And we decline to read into what Sakab calls "the [g]overnment's measured forbearance" and intuit that, by not affirmatively recommending dismissal as it does (Sakab says) "more

Our response to this suggestion echoes what has already been carefully elucidated by the Ninth Circuit:

> Our conclusion [that further litigation poses an unacceptable risk of disclosure of state secrets] holds no matter what protective procedures the district court might employ. Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases like this one, where the relevant secrets are difficult or impossible to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication. In these rare circumstances, the risk of disclosure that further proceedings would create cannot be averted through the use of devices such as protective orders or restrictions on testimony.

Mohamed, 614 F.3d at 1089. So it is here.[13]

---

often than not," the government nonetheless is staking out some sort of position on this or that it proves the government's belief error was committed. Indeed, as the government pointed out at oral argument, the U.S. doesn't need to support dismissal in order to protect state secrets, particularly where the United States isn't a party to this suit between private parties.

[13] We reject Sakab's characterization of the risk-of-disclosure precedent as not justifying dismissal -- that the case law limits us to three situations in which dismissal is required (the very subject matter was a state secret, plaintiffs can't show a prima facie case, defendants can't properly defend) and the concept of any attempt to proceed risking disclosure is in essence just "a different label" for the first type of scenario (the very subject of litigation is a state secret). Not so.

The standard is that dismissal is required when any attempt to proceed would risk or require disclosure of privileged information -- and the case law bears out examples of circumstances in which dismissal would protect against that risk (like when a plaintiff cannot prove the prima facie elements of a claim without the use of privileged evidence, or a defendant can't properly

- 33 -

Bottom line: "[S]ome matters are so pervaded by state secrets as to be incapable of judicial resolution once the privilege has been invoked," El-Masri, 479 F.3d at 306, and this is one such matter. "[T]he circumstances make clear that privileged information [is] so central to the litigation that any attempt to proceed will threaten that information's disclosure." Id. at 308; see also Wikimedia, 14 F.4th at 303; Mohamed, 614 F.3d at 1077, 1089 (quoting Totten, 92 U.S. at 107); Sterling, 416 F.3d at 347-49; Fitzgerald, 776 F.2d at 1243.[14]

Before we move along, a few final words. We recognize that the successful assertion of the state secrets privilege can

_____

defend without using that information). It's our job to examine the nature of the privileged information and its centrality to the anticipated litigation as a whole, then weigh the risk of disclosure if that litigation proceeds. It's clear to us that this case runs this risk for the many reasons described above.

[14] Our conclusion that, from all the circumstances, privileged information will be so central to the litigation that any attempt to proceed will threaten the information's disclosure means we need not specifically address the availability-of-defenses quarrel. We do note, though, that it's clear on the facts of this case the issues are linked (emphases ours): "Circumstances in which any valid defense would require resort to privileged materials are those in which 'state secrets are so central to [the] proceeding that it cannot be litigated without threatening their disclosure.'" Wikimedia, 14 F.4th at 304 (quoting El-Masri, 479 F.3d at 308). See also Gen. Dynamics Corp., 563 U.S. at 486 ("Where liability depends upon the validity of a [certain] defense, and when full litigation of that defense would inevitably lead to the disclosure of" state secrets, neither party can obtain judicial relief. (cleaned up)); id. ("It is claims and defenses together that establish the justification, or lack of justification, for judicial relief.").

result in a harsh outcome for litigants who want a case to proceed. See, e.g., Sealed Case, 494 F.3d at 148 ("As Judge Learned Hand observed, a claim of the state secrets privilege will often impose a grievous hardship, for it may deprive parties . . . of power to assert their rights or to defend themselves. That is a consequence of any evidentiary privilege." (cleaned up)); Fitzgerald, 776 F.2d at 1238 n.3 ("When the state secrets privilege is validly asserted, the result is unfairness to individual litigants -- through the loss of important evidence or dismissal of a case -- in order to protect a greater public value."). In this matter, the specific reasons for the government's assertion of the state secrets privilege were explained in the classified declarations we mentioned many pages ago. Those declarations provide detailed descriptions of the nature of the information that our Executive wants to protect, and they also explain why disclosure would threaten our national security. The declarations decisively inform and support our conclusion today. We can appreciate the frustration of not being in the know when it comes to some of the specific (classified) reasons supporting dismissal here. Sakab voices concerns about "graymail tactics" being used by Appellees (or, as a policy matter, by any defendants who happen to have knowledge of state secrets) to thwart litigation against them by harnessing or weaponizing state secrets that aren't actually at issue to secure a dismissal. Perhaps these concerns are

understandable in the abstract, but they are misplaced: The requisite layers of review and scrutiny we've already described in detail provide protection against that type of strategic gamesmanship and prevent attempts to abuse state secrets, and here, that review and scrutiny counsel our outcome.

Having answered the threshold "can the case proceed" question in the negative, we now must answer this question: Notwithstanding the fact that the case can't be litigated and must be dismissed as a result of the assertion of the state secrets privilege, is Sakab nevertheless entitled to the preliminary relief it seeks?

## Preliminary Relief

Before the district court, Sakab sought a few types of preliminary relief: prejudgment attachment; a recording of lis pendens; and a stay of the Massachusetts case pending the outcome of the Ontario action.

Pursuant to our above analysis, litigation of the case can't proceed, and the complaint must be dismissed. But Sakab says that doesn't necessarily mean it isn't entitled to some preliminary equitable relief. Truth be told, Sakab has represented throughout the Massachusetts case that it doesn't even want to pursue litigation here -- it just wants to encumber the subject Massachusetts properties and to then secure a stay of the action pending a final judgment in Ontario, where it plans to litigate

the merits. And in Sakab's telling, we need not pull at the state-secrets thread or consider the merits of Sakab's complaint to provide it with preliminary relief. Like the district court, we are not persuaded.

*Prejudgment Attachment*

Sakab argues the district court's handling of the prejudgment attachment relief issue was both premature and substantively wrong. Given the nature and posture of this case, we disagree with Sakab's contentions.

As a threshold matter, Sakab says any disposition of the prejudgment attachment was premature because there was no pending motion for that relief. But the district court clearly understood that requested relief to be before it. And rightly so. Not only did Sakab reiterate its interest in and affirmatively argue the prejudgment attachment issue to the district court in its various papers and at the November 2021 show-cause hearing, but also the record reflects that Sakab had a pending motion (with memorandum of law in support and proposed findings) for prejudgment attachment in state court, meaning it was transferred with the record to the district court. See L.R., D. Mass. 81.1 (providing for filing of state court record upon removal). The issue of prejudgment attachment was squarely presented to the district court. And in any event, as we'll explain, the district court's point was that

- 37 -

any such motion would be untenable for the reasons it offered.  So let's get into that.

According to Rule 64(a) of the Federal Rules of Civil Procedure, which incorporates state law to determine the availability of a prejudgment attachment of property, a court may grant every remedy, under the law of the state where the court is located, that "provides for seizing a person or property to secure satisfaction of the potential judgment."  Fed. R. Civ. P. 64(a); Grupo Mexicano, 527 U.S. at 330-31.  In Massachusetts, Rule 4.1 of the Rules of Civil Procedure, along with chapter 223, section 42 of Massachusetts General Laws, direct the availability of prejudgment attachment.  Rule 4.1(a) instructs that, "[s]ubsequent to the commencement of any action under these rules, real estate, goods and chattels and other property may, in the manner and to the extent provided by law, but subject to the requirements of this rule, be attached and held to satisfy the judgment for damages and costs which the plaintiff may recover."  Mass. R. Civ. P. 4.1(a).  Before ordering a prejudgment attachment, a court must first find that "there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment."  Mass. R. Civ. P. 4.1(c); see also Mass. Gen. Laws ch. 223, § 42 (2022) (providing (with

exceptions not relevant to this case) that all real property "may be attached upon a writ of attachment in any action in which the debt or damages are recoverable, and may be held as security to satisfy such judgment as the plaintiff may recover").

The district court reasoned that Sakab could not make the prerequisite showing of a reasonable likelihood of success on the merits without implicating state secrets. See Sakab II, 578 F. Supp. 3d at 144. And the district court declined to "rule as an exercise of comity with respect to the interlocutory decisions of the Ontario" court that Sakab "has satisfied the reasonable likelihood standard," particularly when Sakab could not point to examples of a federal court doing what Sakab was seeking. Id. Indeed, as the district court explained, "Rule 64 limits the available prejudgment remedies to those which 'secure satisfaction of the potential judgment,'" id. (quoting and emphasizing Fed. R. Civ. P. 64), while "Rule 4.1 likewise limits prejudgment relief to that which can be 'held to satisfy the judgment . . . which the plaintiff may recover,'" id. (quoting and emphasizing Mass. R. Civ. P. 4.1(a)). Each of these rules talk about "the" (not "a") judgment (if there is one) obtained in the action before that court, and they do not "contemplate that the likelihood of success in another, foreign action can justify prejudgment attachment in the action at hand." Sakab II, 578 F. Supp. 3d at 144.

And, as the district court observed, section 42 stymies Sakab's argument with a one-two punch:

> [F]irst, in prescribing attachment in actions in which the debt or damages are demonstrably recoverable, which is not this case, and second, in designating attachment as security to satisfy "such judgment as the plaintiff may recover", a phrase which read in context gives no indication of encompassing judgments recovered in other, foreign jurisdictions.

Id. (quoting ch. 223, § 42).

This is all correct. Despite Sakab's efforts to demonstrate otherwise,[15] Massachusetts' law and Rule 4.1 are clear and do not require any mental gymnastics given the posture of this case: This attachment relief is available only upon a finding of reasonable likelihood of success. That likelihood of success could not be shown in this case for all the state-secrets reasons much

---

[15] For example, Sakab writes that the district court "mistakenly assumed that the prejudgment attachment on the basis of comity would secure a potential *Ontario* judgment," apparently suggesting that Sakab wanted an adjudication of its Massachusetts case. This is difficult to square with Sakab's representations below that the district court didn't need to "consider the underlying evidence of the parties' claims and defenses" in the Massachusetts case because the court could just accord comity to the Ontario court's rulings. But it's clear to us the focus by Sakab was and is on using the Ontario Mareva injunction to secure preliminary relief in Massachusetts. If the name of Sakab's game had been to secure relief in Massachusetts based on the Massachusetts state law complaint, it would have needed to show a likelihood of success on that complaint. For the same reasons we've explained and continue to explicate, that merits inquiry could not be assessed because of the assertion of the state secrets privilege.

discussed to this point -- doing so would tread too closely to the boundaries of the privilege assertion, and too much evidence was swept up within that assertion.  There is no precedent compelling us to forgo the touchstone merits inquiry necessary to meet Rule 4.1's requirements by relying on comity to Ontario's preliminary injunction -- a Mareva injunction at that[16] -- which provides only that, as a typical pre-discovery, asset-freezing injunction matter (as opposed to a final foreign judgment, which Sakab does not have), Sakab was likely to prevail in the Ontario case -- not the Massachusetts case.

*Lis Pendens*

Sakab also asked the district court to issue a lis pendens recording and then stay the matter, and argues here that the district court circularly rejected that request based on its erroneous conclusion that dismissal of the case proper was required based on the state secrets privilege.  Rather, Sakab argues, the district court should have simply issued the lis pendens, stayed the case to preserve the Massachusetts action without any risks to

---

[16] Global, asset-freezing Mareva orders -- "a powerful tool for general creditors," Grupo Mexicano, 527 U.S. at 329 -- are unavailable here in the United States, where our Supreme Court has said "[e]ven when sitting as a court in equity, we have no authority to craft a 'nuclear weapon' of the law like the one advocated here," id. at 332-33.  See also id. at 333 ("The debate concerning this formidable power over debtors should be conducted and resolved where such issues belong in our democracy: in the Congress.").

- 41 -

national security, and awaited a final judgment in the Ontario case. These arguments, though, do not persuade.

"Lis pendens" means "[a] pending lawsuit." Lis Pendens, Black's Law Dictionary (11th ed. 2019); see also id. ("A notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome."). And specifically under Massachusetts law, a memorandum or recording of lis pendens may issue if a case's subject matter concerns a claim of title to real property. See Mass. Gen. Laws ch. 184, § 15(b). Indeed, a lis pendens is a tool meant to provide recorded notice of lawsuits that impact title to real property. See, e.g., Wolfe v. Gormally, 802 N.E.2d 64, 67-68 (Mass. 2004) (citing and discussing evolution of ch. 184, § 15); id. at 70 (concluding that the record title at issue should "reflect the pendency of [an] action so as to give notice to prospective purchasers of the contested lots that the proposed use of those lots is subject to active legal challenge," so approval of the memorandum of lis pendens was appropriate); Debral Realty, Inc. v. DiChiara, 420 N.E.2d 343, 347 (Mass. 1981) ("A memorandum of lis pendens, like an attachment of real estate, temporarily restricts the power of a landowner to sell his or her property, by depriving the owner of the ability to convey clear title while the

litigation is pending."). In explaining the history and policy undergirding the lis pendens mechanism, the Wolfe court observed that the lis pendens statute "thus allowed courts to retain control over the subject matter of the litigation while the action was pending," 802 N.E.2d at 67 (citing F.T. Talty, P.S. Talty, et al., Methods of Practice § 8:19 (4th ed. 2000)), "and protected prospective buyers by enabling them to obtain 'notice of pending litigation affecting title' through the registry of deeds, in the same way that they searched for record encumbrances," id. (quoting DiChiara, 420 N.E.2d at 346).

Particularly in view of this policy context, we conclude the district court got the lis pendens issue right, too. The district court rightly explained that a lis pendens is derivative of the underlying claims -- it should reflect an action's pendency. Sakab II, 578 F. Supp. 3d at 145 (citing Wolfe, 802 N.E.2d at 70). It thus declined to issue the lis pendens here because "the underlying proceeding to which the lis pendens would refer consists of ten claims [(the entirety of Sakab's complaint, that is)] which the Court has determined must be dismissed." Id.

Indeed, the point of a lis pendens is that it's linked to litigation -- the idea being that pending litigation is what the lis pendens is meant to warn third parties about. So, given the circumstances of this matter -- we and the district court having determined the suit will be dismissed -- can a lis pendens

issue nonetheless?  There is no pending Massachusetts lawsuit, nothing over which the court should or could retain control, see Wolfe, 802 N.E.2d at 67 (observing the lis pendens statute "allowed courts to retain control over the subject matter of the litigation while the action was pending"), so we think not.  Sakab calls this reasoning circular, but really it's a typical linear sequence of legal analysis wherein one determination dictates the outcome of the next.  And like in the district court, the sequence here ends with us rejecting Sakab's lis pendens position.

Also problematic in Sakab's lis-pendens-and-stay asseveration:  There is no Massachusetts precedent that requires issuance of a lis pendens recording for an indefinite duration -- and not on the merits of "the underlying proceeding," ch. 184, § 15(b), but instead on the (as yet undetermined) merits of a foreign proceeding.  Indeed, what Sakab is after is encumbrances of Appellees' real estate in Massachusetts, pre-foreign judgment, and an indefinite stay of a Massachusetts case it has no intention of trying to litigate during the pendency of the foreign suit.  Sakab is right, of course, that sometimes our courts will stay litigation pending the outcome of parallel litigation abroad.  But the non-binding cases[17] to which Sakab points us don't support what

---

[17] Louis Vuitton N. Am., Inc. v. Schenker S.A., No. 17-CV-7445, 2019 WL 1507792, at *1 (E.D.N.Y. Mar. 31, 2019); Pexcor Mfg. Co., Inc. v. Uponor AB, 920 F. Supp. 2d 151, 152 (D.D.C. 2013); Argus Media Ltd. v. Tradition Fin. Servs. Inc., No. 09 Civ.

Sakab is trying to do here:  Those cases don't involve stays sought by the plaintiffs in U.S. suits in the wake of an order encumbering a defendant's property, nor do they involve a U.S. court putting a lien on property for the pendency of litigation in a foreign forum without also entertaining a merits defense against that lien.

*Stay*

To be clear, the result of our prejudgment attachment and lis pendens analyses is that Sakab is not entitled to a stay that would hinge on or flow from either of those forms of relief. To the extent Sakab is seeking a stay simpliciter, untethered to any property-secured equitable relief, we likewise conclude it is not entitled to that relief.  The case is dismissed; there is nothing to stay.  And we decline to revive the case just to indefinitely stay it while the Ontario litigation plays out.  To do so is unsupported by our precedent and runs counter to the idea that Appellees, as defendants to this ten-count complaint,[18] are entitled to defend against it rather than being stuck in unlimited limbo.

---

7966(HB), 2009 WL 5125113, at *1 (S.D.N.Y. Dec. 29, 2009); Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248, 250, 256 (D. Mass. 1999); Evergreen Marine Corp. v. Welgrow Int'l Inc., 954 F. Supp. 101, 102-03 (S.D.N.Y. 1997).

[18] And of note, Sakab's state law complaint does not include a claim to recognize or enforce a foreign judgment under Massachusetts' Uniform Enforcement of Foreign Judgments Act, Mass. Gen. Laws ch. 218, § 4A.

In the end, Sakab has not demonstrated it is entitled at this time to any of the preliminary relief it requested.[19]

## CONCLUSION

For the foregoing reasons, we <u>affirm</u> the order of the district court.  Each side shall bear its own costs.

---

[19] That said, Sakab's toolkit is not empty.  Ontario's Mareva injunction includes the Massachusetts properties.  The comprehensive receivership order likewise lists the Massachusetts properties, along with a Washington, D.C. property and shares in a Canadian company.  Should Sakab secure the judgment in Ontario, nothing in today's opinion should be read to prevent it from pursuing remedies here.